# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### (Newark)

MELINDA FARINA, and
BEAUTY BROKERS – MELINDA
FARINA INCORPORATED,

              Plaintiff,

v.

DANA ABED OMARI,

              Defendant.

Civ. A. No.: 24-11098

**Hon. Susan D. Wigenton, U.S.D.J.**

**Hon. André M. Espinosa, U.S.M.J.**

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE SEEKING DISMISSAL PURSUANT TO THE UNIFORM PUBLIC EXPRESSION PROTECTION ACT, N.J.S.A. 2A:53A-49 *et seq.*

---

**McCARTER & ENGLISH, LLP**
Daniella Gordon, 39372005
Kieran T. Ensor 305662019
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Phone: (973) 622-4444
dgordon@mccarter.com
kensor@mccarter.com

*Attorneys for Defendant*
*Dana Abed Omari*

Date:  February 14, 2025

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT .................................................................1

II.    STATEMENT OF FACTS ......................................................................5

    A.    Plaintiffs – Farina and Beauty Brokers .................................5

    B.    Omari .....................................................................................7

    C.    The Complaint and The Public Record ...............................7

III.    ARGUMENT ....................................................................................15

    A.    The Complaint Must Be Dismissed Pursuant to UPEPA As An Impermissible Strategic Lawsuit Against Public Participation ..........16

    B.    The Complaint Must Be Dismissed For Failure to State a Claim for Defamation or False Light. .............................................17

    C.    Plaintiffs Fail to State a Claim for Tortious Interference With Prospective Economic Advantage ........................................24

    D.    Conclusion ...........................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*,
    332 F. App'x 787 (3d Cir. 2009)...........................................................................25

*Dill v. Yellin*,
    725 F. Supp. 3d 471 (D.N.J. 2024).....................................................................24

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985).............................................................................................18

*Eli Lilly & Co. v. Roussel Corp.*,
    23 F. Supp. 2d 460 (D.N.J. 1998).......................................................................25

*Fenico v. City of Phila.*,
    70 F.4th 151 (3d Cir. 2023) ................................................................................18

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)...............................................................................................18

*Harmon v. Borough of Belmar*,
    No. 17-2437, 2018 WL 6068216 (D.N.J. Nov. 20, 2018)...................................25

*St. Amant v. Thompson*,
    390 U.S. 727 (1968).............................................................................................18

**State Cases**

*Aristocrat Plastic Surgery, P.C. v. Silva*,
    206 A.D.3d 26 (2022) ..........................................................................................19

*Costello v. Ocean County Observer*,
    136 N.J. 594 (1994) .............................................................................................18

*Glass v. Suburban Restoration Co.*,
    317 N.J. Super. 574 (App. Div. 1998)................................................................19

*Lawrence v. Bauer Publ'g & Printing Ltd.*,
    89 N.J. 451 (N.J. 1982)........................................................................................18

*Leang v. Jersey City Bd. of Educ.*,
198 N.J. 557 (2009) ...................................................................................17

*Neuwirth v. State*,
476 N.J. Super. 377 (App. Div. 2023) ........................................................18, 19

*Ourian v. Farina, et al*,
1:19-cv-24059 ...........................................................................................10

*Rocci v. Ecole Secondaire Macdonald-Cartier*,
165 N.J. 149 (2000) ...................................................................................18, 19

*Romaine v. Kallinger*,
109 N.J. 282 (1988) ...................................................................................20

*Swan v. Boardwalk Regency Corp.*,
407 N.J. Super. 108 (App. Div. 2009) .........................................................20

*Turf Lawnmower Repair v. Bergen Record Corp.*,
139 N.J. 392 (N.J. 1995) ............................................................................19

*Ward v. Zelikovsky*,
136 N.J. 516, 528 (1994) ...........................................................................20

*W.J.A. v. D.A.*,
210 N.J. 229 (2012) ...................................................................................22

**State Statutes**

N.J.S.A. 2A:53A-49 *et seq.*...........................................................................16

N.J.S.A. 2A:53A-50 ......................................................................................16

N.J.S.A. 2A:53A-51 ......................................................................................16

N.J.S.A. 2A:53A-53 ......................................................................................16

N.J.S.A. 2A:53A-56 ......................................................................................16

N.J.S.A. 2A:53A-57 ......................................................................................17

N.J.S.A. 2A:53A-58 ......................................................................................17

N.J.S.A. 2A:53A-59 ......................................................................................17

Uniform Public Expression Protection Act ...............................................................1

**Rules**

Rule 11(b)...............................................................................................................15

**Regulations**

N.J. Admin. Code § 13:35-6.17 .............................................................................22

**Constitutional Provisions**

First Amendment....................................................................................................18

**Other Authorities**

*Hovsepian v. Integrated Aesthetics and Farina*,
    Index No. 653300 .........................................................................................10, 21

https://gifts.aman.com/physical-aman-gift-card-030718........................................12

https://industrym.com/beauty-broker/?city=staten%20island .................................5

https://www.apple.com/shop/buy-tv/apple-tv-4k/128gb .................................13, 14

https://www.dior.com/en_us/fashion/womens-fashion/bags/lady-dior ..................11

https://www.instagram.com/beautybrokerofficial/?hl=en ....................................6, 7

https://www.instagram.com/igfamousbydana/?hl=en ..............................................7

https://www.millesima-usa.com/champagne-dom-perignon-vintage-
    2015.html .........................................................................................................12

https://www.thebeautybrokers.com/ .......................................................................6

https://www.thebeautybrokers.com/meet-the-beauty-broker ..................................5

*Plastic Surgery Dealer*, Oct. 12, 2012
    (https://www.thecut.com/2012/10/plastic-surgery-pimp.html) ..........................9

## I.    **PRELIMINARY STATEMENT**

Defendant Dana Omari ("Omari") files this Order to Show Cause seeking to dismiss a Strategic Lawsuit Against Public Participation ("SLAPP") pursuant to the Uniform Public Expression Protection Act ("UPEPA" or "anti-SLAPP law").  The Complaint is part of an intimidation campaign designed to silence speech about Plaintiffs' surgical referral enterprise.  The Complaint does not meet the requisite pleading standards for any of the counts alleged and should be dismissed.

Plaintiffs Melinda Farina ("Farina") and Beauty Brokers – Melinda Farina Inc. ("Beauty Brokers") (collectively "Plaintiffs") operate a surgical referral "consultancy."  As part of their services, Plaintiffs collect fees from patients that are seeking cosmetic surgery in exchange for referrals to cosmetic surgeons within Plaintiffs' "exclusive network."

The Complaint against Omari states claims for: 1) defamation, 2) false light [invasion of privacy], and 3) tortious interference with prospective economic advantage.  Each count of the Complaint stems from a single social media post that Omari made in November of 2024 (the "Post").  The Post contains various statements concerning Plaintiffs' ethical conflicts, legality, and professionalism.  It discusses Plaintiffs' reported receipt of simultaneous compensation from patients and surgeons, Plaintiffs' "alleged" receipt of "kickbacks," and third parties' opinions about Plaintiffs' demeanor and services.

The pleading standards for claims of defamation, false light, and tortious interference with prospective economic advantage are well-established.  When the subject of a defamation or false light claim relates to a "matter of public concern" or a public figure, it is subject to an "actual malice" standard.  Under this standard, a plaintiff must plead and ultimately prove by clear and convincing evidence that a defendant made an alleged defamatory statement with actual knowledge of its falsity or reckless disregard for its falsity.  Negligent publishing is not enough.  Similarly, claims for tortious interference with prospective economic advantage must also plead and prove "malice" on the part of the defendant.  Such claims must also identify specific economic opportunities that were lost as a result of the defendant's conduct.  Vague pleadings that refer to general or assumed business loss are not sufficient under the law.

Here, with respect to Plaintiffs' defamation and false light claims, the Complaint does not specify which exact statements within the Post are supposedly defamatory or cast a false light upon Plaintiffs.  To the extent that certain statements are vaguely identified, the Complaint fails to allege any facts regarding "actual malice."  For instance, Plaintiffs state in the Complaint that they have never received compensation from surgeons, but they do not allege that *Omari* "knew" this to the case at the time of the Post, or recklessly disregarded information to that effect.

Critically, although a statement does not have to be true in order to be defensible under an "actual malice" standard, each statement in the Post is corroborated by allegations contained in lawsuits filed against Plaintiffs, and information that Plaintiffs themselves generated. That record includes:

- Two prior lawsuits against Farina and her businesses in which they are alleged to receive simultaneous compensation from patients and doctors, and in which they are alleged to promise "referrals" in exchange for a fee;

- Farina's own statements in published interviews in which she has acknowledged that surgeons pay to be in her exclusive referral network, and in which medical professionals speculate about the propriety of such arrangements;

- Language from Plaintiffs' own website, where she refers to patients and surgeons as "clients," and archived versions of Plaintiffs' website and business affiliate where Plaintiffs solicit surgeons to become paying members of Farina's referral network;

- Farina's public and private statements in which she thanks surgeons for exorbitant "gifts," sent in "appreciation" for what she does for them, worth thousands of dollars; and

- Numerous public complaints about Plaintiffs' professionalism on multiple internet forums.

In addition to public sources of information, Omari has also received private messages, which, if substantiated, undermine Plaintiffs' claims that any of the statements relating to Plaintiffs' business operations are "false." One such message, received anonymously after this litigation was initiated, includes a seeming mail from Farina directed to Beauty Brokers' "network" of doctors. In the email, Farina

proposes a new "protocol" under which doctors in her "network" are asked to reduce their fee to patients by 10% so that Plaintiffs may directly charge that *exact amount* to their patients and retain those proceeds for themselves.

With respect to tortious interference with prospective economic advantage, Plaintiffs again fail to satisfy the malice standard. Moreover, they fail to identify (much less connect) any actual lost business suffered a result of the Post. This count of the Complaint also fundamentally fails because any purported "loss" would be the result of Omari's exercise of protected speech, making the loss unrecoverable.

The anti-SLAPP law requires an expedited review of the sufficiency of lawsuits that relate to matters of public concern and that stifle freedom of speech. If the Court determines this matter to be a SLAPP suit, the sufficiency of each element of each count of the Complaint must be reviewed. If the elements are not met, the case must be dismissed with prejudice and legal fees must be awarded to the defense.

Here, the lawsuit must be found to be a SLAPP, and must be dismissed with prejudice with legal fees awarded to Omari. In the interim, Omari respectfully seeks the presumptive stay available under the anti-SLAPP law.

## II.    STATEMENT OF FACTS

Plaintiffs' claims stem from a single Instagram Post made by Omari in November of 2024.  *See* Complaint, p. 5.  In the Post, Omari writes about the seemingly conflicted nature of Plaintiffs' financial relationships with cosmetic surgeons, on the one hand, and patients, on the other hand, who consult with Plaintiffs for the purpose of receiving recommendations for cosmetic surgeons.  *Id.* The Post states that Plaintiffs "allegedly get kickbacks."  *Id.*  The Post also includes a link to a Reddit forum post, created by another commentator, entitled "Beauty Broker's Little Black Book of Surgeons," which includes opinions by others regarding Plaintiffs' professionalism and quality of service.  *Id.*

### A.  Plaintiffs – Farina and Beauty Brokers

The Beauty Brokers website identifies Farina as the "Founder of Integrated Aesthetics Consulting Inc. and Beauty Brokers Inc. in 2004." https://www.thebeautybrokers.com/meet-the-beauty-broker.  The website promotes a range of services, including serving as a for-profit "broker" between cosmetic surgeons and patients seeking cosmetic surgery.  *Id.*; *see also* Exhibit A (Industry Magazine, July 24, 2017) (https://industrym.com/beauty-broker/?city=staten%20island) ("As owner of The Beauty Brokers, Inc., an aesthetic consulting firm that has referred thousands of clients to a network of surgeons over the past 15 years, Farina has made it a business to play matchmaker between patient

and practitioner.").  The Beauty Brokers website claims that it has provided cosmetic surgery consultation services to 50,000 patients, and that it has 2,000 surgeons "in network."  https://www.thebeautybrokers.com/.

The Beauty Brokers website is ambiguous in its description of Farina's credentials.  It states that she holds certain "licenses" and "certificates," and refers to "training" in a potential medical setting.  *Id.*  Farina is not known to hold any medical licenses or to have formal medical training outside of dental hygiene. Exhibit A ("I became so interested in the field of dentistry that I went to school for dental hygiene.").

The Beauty Brokers website states that Farina is has appeared on numerous shows "… as a [sic] expert health and beauty commentator, business mentor and as an actual patient of her *clients*…"  https://www.thebeautybrokers.com/ (emphasis added).  "Clients" of Farnia, as used here, refers to surgeons.

Beauty Brokers markets its services through a variety of methods, one of which is its self-titled Instagram page, @beautybrokerofficial, which Farina appears to operate.  https://www.instagram.com/beautybrokerofficial/?hl=en.  There, Farina identifies herself as a "public figure" and founder of Beauty Brokers, which she describes as a "Top Global Aesthetics Consultancy."  *Id.*  Farina also identifies herself as founder of an affiliated company, Integrated Aesthetics Consulting, Inc. ("Integrated Aesthetics").  *Id.*  Two links are pinned to the top of the Beauty Brokers

6

Instagram page.  *Id.*  The first link is to the business website for Beauty Brokers, the second link is to a list of endorsed products.  *Id.*

### B.  <u>Omari</u>

Omari has a B.S in Nutrition Biochemistry and a B.A. in Literature.  Omari also holds a Master's degree in Human Nutrition, and is a Registered Dietician.  She resides in Texas.  Exhibit B.

Omari maintains an Instagram page, <u>@igfamousbydana</u>, where she discusses aesthetic trends, cosmetic procedures, possible cosmetic procedures that celebrities have received, and her own experiences with cosmetic procedures and products, among other personal observations unrelated to aesthetics. <u>https://www.instagram.com/igfamousbydana/?hl=en</u>.  *Id.*  Omari does not own a cosmetic surgery consultation company and does not sell cosmetic surgery consultation services.  *Id.*

### C.  <u>The Complaint and The Public Record</u>

In November of 2024, Omari published an Instagram post in which she noted Farina's background as a dental hygienist, Plaintiffs' alleged history of financial compensation from both medical professionals and patients, and various complaints, readily visible on various internet forums, regarding Farina's professional conduct Complaint, p. 5.  Plaintiffs cite portions of the Post as the sole basis for this litigation.

In paragraph 17 of the Complaint, Plaintiffs appear to target the following statement:  "Plaintiff MELINDA FARINA 'is just a dental hygienist who gets paid on both ends to book patients with plastic surgeons she says are in her 'little black book.'"  Complaint at paragraph 17.  Regarding these statements, Plaintiffs allege, "This is clearly a defamatory and libelous statement about Plaintiffs' business."  *Id.*

In paragraph 18 of the Complaint, Plaintiffs appear to complain that the Post states that Farina "allegedly gets kickbacks."  *Id.* at paragraph 18.  While it is not clear precisely which statements within the Post are the subject of the Complaint, Plaintiffs also seem to complain that the Post reiterates other parties' comments about Farina's perceived rudeness, cancellations, tardiness, and various patients' reported difficulties obtaining refunds for allegedly deficient services.  *Id.*

Putting aside the vague and conclusory nature of Plaintiffs' seeming objections to the Post, none of the statements in the Post are actionable.  Plaintiffs generally categorize Omari's "statements" in the Post as "false," Complaint at paragraph 30; however, apart from the conclusive denial contained in paragraph 19, Plaintiffs do not specifically identify which components of the Post are "false," much less defamatory under the law, nor do they state that Omari "knew" the information to be false at the time of the Post.

With respect to paragraph 17, it is true that Farina has worked as a dental hygienist.  *See e.g.* Exhibit A.  It is also true Farina and her affiliated businesses have

previously admitted their receipt of simultaneous compensation from patients and doctors. *Id*. ("They [doctors] would pay an annual fee to be in my network, and I would refer clients to their office;" "Farina currently [2017] sees 10 clients a day, offering each an hour consult for a small fee."); Exhibit C, The Cut, *The Plastic Surgery Dealer*, Oct. 12, 2012 (https://www.thecut.com/2012/10/plastic-surgery-pimp.html) ("She just takes $10,000 a year from 226 specialists in her referral network," referring to affiliated business, Integrated Aesthetics, as referenced on the Beauty Broker website and Instagram page).

With respect to the content of paragraph 18, once again, Plaintiffs have previously admitted receiving compensation for membership in their referral service. *Id.* Notably, subsequent to the Post, Plaintiffs posted photographs on Instagram of extravagant "gifts" that Farina has received from surgeons that she favors, which would constitute compensation. *Infra* at p. 11-13.

In paragraph 19 of the Complaint, Plaintiffs state, "<u>At no times have Plaintiffs been paid by the doctors to whom they refers [sic] clients.</u>" Complaint at paragraph 19 (emphasis added). This comment, however, is belied by Farina's interviews, the lawsuits filed against her and her affiliated businesses, and pictures that she has posted on the Beauty Brokers Instagram account of gifts that she has publically and/or privately acknowledged as having come from doctors. Specifically:

- In a Complaint filed against Farina and Integrated Aesthetics in the Supreme Court of New York, Dr. Rafi Hovsepian, MD, alleges that he

paid $10,200 to join Farina and Integrated Aesthetics' referral network for one year. In exchange for payment to join the network, Dr. Hovsepian alleges that he was promised at least three (3) tummy tuck/liposuction referrals, among other services. *See* Complaint, *Hovsepian v. Integrated Aesthetics and Farina*, Index No. 653300, Supreme Court of New York ("Hovespian Complaint"). Exhibit D.

- In a federal Complaint filed by Simon Ourian, MD, in the Southern District of Florida against Farina, Beauty Brokers, and Integrated Aesthetics, Dr. Ourian alleges, "Under the guise of providing a public service, Farina employs Beauty Brokers and Integrated Aesthetics as instrumentalities to generate revenue while simultaneously working for doctors and their patients. Through what she promotes as an "Exclusive Referral Network," Farina acts as a "broker" steering clients/patients to aesthetic and cosmetic professionals who pay "membership fees" to Defendants." *Ourian v. Farina, et al*, 1:19-cv-24059, Southern District of Florida, Complaint 1 at paragraph 2 ("Ourian Complaint") (emphasis added). Exhibit E.

- Plaintiff has admitted in interviews that doctors pay to be in her referral network. For example, Farina's interview with *The Cut*, published on October 2, 2012, provides as follows, and includes a quote from Farina:

  > Fee splitting is illegal in the medical industry, but Melinda insists that by collecting yearly *membership* fees, from doctors like Zdinak, she stays clean. As for digs that she's sending vulnerable patients to people she's in business with, Farina bites right back, "I work with only the best and I do not fuck around. You screw anything up on my clients, and I mean anything, and you're out of my network; I don't care how much you've paid me."

  Exhibit C (italic emphasis in original; underline emphasis added).

- Archived images of Plaintiffs' current Beauty Brokers website show images of Integrated Aesthetics' promotion to doctors of "membership" opportunities in Plaintiffs' exclusive "referral network" in exchange for a yearly fee, explicitly stating: "EXCLUSIVE REFERRAL NETWORK – Exclusive Invite Only – Annual Membership fee." Exhibit F.



- Farina posted on Instagram as in December of 2024 images of "gifts" that she received from doctors in her network. These include:

  o A Christian Dior handbag believed to be valued at $5,500-$6,500, from a doctor that Plaintiffs identify as "Dr. L;"  *See* Exhibit G ("So pretty! Thank you so much Dr. L."); *see also* https://www.dior.com/en_us/fashion/womens-fashion/bags/lady-dior (image from Dior website below on right).



  o Six bottles of Dom Pérignon Vintage 2015 from "Andy," who thanks Farina for "trusting and believing" in him.  *See* Exhibit H.  The gift is valued at approximately $285.00 per bottle for a total of approximately $1,710.00 for the six bottles pictured. *See*

https://www.millesima-usa.com/champagne-dom-perignon-vintage-2015.html ($285.00 per bottle) (excerpt of images from website on the right);

 

o   An Aman Resort gift card valued between $1,000.00 and $50,000.00, posted with the comment, "Feeling the love from my Colorado fave! Thank you!!!"   *See* Exhibit I; *see also* https://gifts.aman.com/physical-aman-gift-card-030718   (the value for a "physical" Aman Gift Card starts at a minimum of $1,000.00 and goes up to $50,000.00) (excerpt of images from website on right).

 

In a separate, private message (*see* Exhibit J), Farina acknowledges that the Aman Resort gift card came from a surgeon to whom she has sent seventy (70) facelift referrals.

○ In a private message on Instagram with a third party, Farina acknowledges her receipt of approximately <u>twenty (20) such holiday "gifts" from various surgeons</u>. *See* Exhibit J (Farina writing appears on light gray background, third party writing is on purple background).

 

○ An Apple TV device valued at $120.00 from a person that Plaintiffs identify as "Dr. H." *See* Exhibit K; *see also* https://www.apple.com/shop/buy-tv/apple-tv-4k/128gb (image from Apple website below on right)

 

In addition to public sources of information, Omari has also received private messages regarding Plaintiffs' conduct.  One such message, received anonymously after this litigation was initiated, includes what appears to be an email from Farina to Beauty Brokers' network of doctors.

The subject line of the email is, "Beauty Brokers Inc. New Protocol."  *See* Exhibit L**.**  In the email, Farina appears to state that she did away with membership fees for doctors to "prove to the general public that doctors do not 'pay for our referrals.'"  *Id.*  In the absence of those fees, she states, " I have been trying to wrap my brain around a way that this referral relationship can be mutually beneficial." *Id.* To that end, Farina announces a new "protocol" under which doctors are asked to reduce their fee to patients by 10% so that *Plaintiffs may directly charge that exact amount to the patients, and retain those proceeds for themselves*. *Id.*  Farina states, "I have never been one to be comfortable discussing exchange of monies, but I need to start making sure my company also succeeds." *Id.*

If substantiated, the "New Protocol" email would constitute further evidence that Plaintiffs were concerned about negative public perception of the very paid "membership" structure (that they now claim has never existed) long before the Post was published.  Moreover, the proposed arrangement would appear to be a form of "fee-splitting" insofar as doctors are being asked to reduce their fee, not for the financial benefit of the patient, but to allow their referral source, Plaintiffs, to collect

the difference. This admission would render the litigation against Omari not just meritless under UPEPA, but frivolous and sanctionable under Rule 11(b).

## III.    __ARGUMENT__

The Complaint is a SLAPP and must be dismissed under the anti-SLAPP law. Plaintiffs fail to state a claim as to any elements of any of the counts of the Complaint.

With respect to Plaintiffs' claims for defamation and false light, as an initial matter, Plaintiffs are impermissibly vague in their identification of what specific statements are at issue. Additionally, Plaintiffs fail to identify any actually false statement by Omari. Moreover, defamation and false light claims are held to an actual malice standard in matters involving public figures and matters of public concern, which is the case here. This means that even if a statement is not true, for it to be actionable, the person making the statement must actually know that it is false at the time that it is made. Actual malice must be plead with specificity, and Plaintiffs have also failed to meet this standard by any measure.

Similarly, Plaintiffs also do not identify any factual basis for alleged tortious interference with prospective economic gain. The tortious conduct is not established, and the harm is not identified. Plaintiffs do not identify any business loss they have faced as a result of Omari's post. This claim simply recasts Plaintiffs' deficient defamation and false light claims as another tort.

15

Notably, while there is ample ground to dismiss the Complaint on its face for failing to state a *prima facie* case with respect to defamation and false light, the Court is permitted to consider additional evidence, as presented herein, under the anti-SLAPP law in its evaluation of the claims under a summary judgment standard. 2A:53A-54(d).

### A. The Complaint Must Be Dismissed Pursuant to the anti-SLAPP law As An Impermissible Strategic Lawsuit Against Public Participation

On September 7, 2023, New Jersey enacted N.J.S.A. 2A:53A-49 *et seq.*, the anti-SLAPP law. The law took effect on October 7, 2023. The purpose of the anti-SLAPP law is to prevent abusive litigation, known as strategic lawsuits against public participation aimed at silencing free speech through meritless defamation, privacy, or other nuisance claims. The anti-SLAPP law applies broadly as a defense to suits that concern a defendant's exercise of speech, press, assembly, petition, or association rights "matters of public concern." N.J.S.A. 2A:53A-50.

Pursuant to the Act, defendants have sixty (60) days from service of a complaint is brought to file a special motion, *via* order to show cause, to dismiss a suit filed in contravention of the Act. N.J.S.A. 2A:53A-51. Once the motion is filed, all proceedings between the parties, including discovery, are stayed. The court must hold a hearing on the motion "as expeditiously as possible," N.J.S.A. 2A:53A-53, and may consider evidence that would be heard in a summary judgment opposition. N.J.S.A. 2A:53A-56. The court must then rule "as soon as practicable." N.J.S.A.

2A:53A-56. If the court denies the defendant's motion, the defendant may appeal as of right within 30 days. N.J.S.A. 2A:53A-57.

Notably, if the court grants a defendant's motion to dismiss pursuant to the anti-SLAPP law, it must award the defendant their court costs, attorney's fees, and litigation expenses related to the motion. N.J.S.A. 2A:53A-58. If the court denies the motion and finds it was frivolous or brought solely to delay the proceeding, the plaintiff is entitled to recover these fees from the defendant. *Id.* The statute provides that it should be interpreted and applied broadly to protect the exercise of constitutional rights. N.J.S.A. 2A:53A-59.

For the reasons stated at length herein, the Complaint constitutes a SLAPP and must be dismissed. The Complaint is deficient on its face, and given the public record about Plaintiffs and their business practices, Plaintiffs cannot prevail in an effort to declare any portion of the Post defamatory, much less maliciously made.

## B. <u>The Complaint Must Be Dismissed For Failure to State a Claim for Defamation or False Light</u>

The elements of the cause of action for defamation are: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher.'" *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 585 (2009) (quoting *DeAngelis v. Hill*, 180 N.J. 1, 13 (2004)). In cases involving public officials, public figures, and matters of public concern, however, the third element of "fault" is

elevated from a "negligence" standard to an "*actual malice*" standard.  *Neuwirth v. State*, 476 N.J. Super. 377, 391 (App. Div. 2023).

To satisfy the actual malice standard, "a plaintiff must show by clear and convincing evidence that the publisher either knew that the statement was false or published with reckless disregard for the truth." *Id.* (citing *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 165 (1999)).  "That is a high standard." *Id.*  To prove that a publication was made with "reckless disregard" for the truth, a plaintiff must show that the publisher made the statement with a "high degree of awareness of [its] probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964), or with "serious doubts" as to the truth of the publication.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Lawrence v. Bauer Publ'g & Printing Ltd.*, 89 N.J. 451 (N.J. 1982).  Importantly, negligent publishing does not satisfy the actual-malice test.  *St. Amant*, 390 U.S. at 732; *Costello v. Ocean County Observer*, 136 N.J. 594, 615 (1994).

Speech addressing "matters of public concern [is] at the heart of the First Amendment's protection [and] occupies the highest rung of the hierarchy of First Amendment values." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985).  To that end, "speech relates to a matter of public concern when 'it can be fairly considered as relating to any matter of political, social or other concern to the community." *Fenico v. City of Phila.*, 70 F.4th 151, 163 (3d Cir.

2023). Speech on such matters "requires maximum protection." *Rocci v. Ecole Secondaire Macdonald-Cartier*, 165 N.J. 149, 156 (2000).

The heightened standard of actual malice is applied to business activities that intrinsically implicate important public interests, matters of health, and industries heavily regulated by the government. *Turf Lawnmower Repair v. Bergen Record Corp.*, 139 N.J. 392, 411-12 (N.J. 1995) (contrasting same with less regulated industries, such as lawn mower sales, shoe repair of shoes, and everyday products or services that do not intrinsically involve a legitimate public interest). Statements regarding medical professionalism and ethics in have specifically been found in other states to constitute matters of public concern. *Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26, 32 (2022) (medical treatment rendered by a physician and his professional corporation is matter of public concern).

Conclusory pleadings are impermissible in defamation cases, *Glass v. Suburban Restoration Co.*, 317 N.J. Super. 574, 582 (App. Div. 1998), in which "… courts must balance 'an individual's right to protect his reputation . . . and our citizens' right to free expression and robust debate in our democratic society.'" *Neuwirth* at 391 (citing *PetroLubricant Testing Labs., Inc. v. Adelman*, 233 N.J. 236, 243 (2018)); *see also Rocci v. Ecole Secondaire Macdonald-Cartier*, 165 N.J. 149, 155 (2000) (courts in defamation cases must "achieve the proper balance between

protecting reputation and protecting free speech" (quoting *Ward v. Zelikovsky*, 136 N.J. 516, 528 (1994)).

Similar to defamation, false light invasion of privacy is defined as "giv[ing] publicity to a matter concerning another that places the other before the public in a false light [if] (a) the false light in which the other was placed would be highly offensive to a reasonable person, <u>and</u> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. *Romaine v. Kallinger*, 109 N.J. 282, 294 (1988) (emphasis added). "<u>Simply put, false light invasion of privacy is "essentially [a claim] of defamation</u>." *Swan v. Boardwalk Regency Corp.*, 407 N.J. Super. 108, 121 (App. Div. 2009) (emphasis added).

Here, the Complaint fails to state a claim upon which relief may be granted with respect to defamation or false light. The Post concerns public figures, and raises fundamental ethical and legal questions about the nature of Plaintiffs' referrals; specifically, the seemingly conflicted nature of Plaintiffs' receipt of compensation from patients seeking referrals and from surgeons to whom referrals are made. Accordingly it is held to an actual malice standard of pleading and proof.

While the Complaint cites to various language within the Post, the Complaint does not clearly identify which of those statements are the specific subjects of the Complaint. Furthermore, the Complaint fails to articulate what fact, exactly, renders

20

any of the statements in the Post "false." Plaintiffs simply declare them to be "defamatory." The one fact that Plaintiffs deny – having ever received compensation from doctors – appears to be contradicted by multiple sources. Beyond failing to identify any truly "false" statement, Plaintiffs fail to state how the supposed "falsity" rises to the level of "actual malice." They do not allege that Omari knew or recklessly disregarded the fact that any given statement was "false."

Beyond failing to meet the elements, the fact of the matter is that Omari's commentary is supported by the public record, which is replete with information regarding Plaintiffs' financial dealings with surgeons. To the extent that Plaintiffs now deny any history of receiving compensation from surgeons in connection with referrals, such denials are contradicted or brought into question by multiple sources. Regardless of the ultimate truth of Omari's statements or Plaintiffs' denials, the notion that Omari is responsible for maliciously introducing these concepts into public discussion is unsustainable to the point of being frivolous.

Farina's own interviews, Instagram posts, and website content all admit conduct that is referenced in the Post. *See* Exhibits A, C, F, G, H, I, J, K, L. The statements in the Post are not fabricated, they are derived from Plaintiffs' own conduct and content. These facts, combined with the public allegations contained in the filed *Hovsepian* and *Ourian* Complaints, Exhibits D and E, make it impossible for Plaintiffs to proceed with the litigation. Moreover, email identified in Exhibit L,

if substantiated, would suggest that Plaintiffs have at minimum sought to enter fee-splitting arrangements with doctors.[1]

Plaintiffs argue in the Complaint that Omari's use of the phrase "allegedly gets kickbacks" is *per se* defamatory.  This argument fails for the reasons previously stated.  Plaintiffs may disagree with Omari's statements, however, that disagreement does not render Omari's statements "malicious" under the law, and Plaintiffs have plead no facts to support such a conclusion.  Moreover, while New Jersey still recognizes claims for defamation *per se*, that only applies in cases brought by private citizens involving only private concerns, and only for nominal damages.  *W.J.A. v. D.A.*, 210 N.J. 229, 247, 249 (2012).

Notably, New Jersey law prohibits certain conduct that appears to be at issue in this matter.  Under N.J. Admin. Code §13:35-6.17, titled, "Professional fees and investments, prohibition of kickbacks:"

> A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or

---

[1]  Other evidence presented is sufficient to dispose of the claims; however, to the extent that the Court seeks to further authenticate Exhibit L, specifically, it may permit, and Omari would seek, limited discovery into that correspondence and Plaintiffs' correspondence with doctors generally regarding their financial arrangements.  This is for the express purpose of allowing Omari to show that another party has "failed to satisfy its burden" with respect to "falsity" pursuant to N.J.S.A. 2A:53A-52(d).

promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use <u>or making or receiving a referral to or from another for professional services</u>.

*Id.* (emphasis added).

While Farina is not known to hold any medical license, the doctors that send her gifts, which are in excess of "nominal" value, presumably do hold medical licenses. As such, those doctors would be prohibited under New Jersey law from giving a licensed or unlicensed source a gift of more than nominal value that a reasonable person would recognize as having been given in appreciation for or to promote the receipt of a referral.

Farina has characterized the items that she has received from doctors as "gifts," or "appreciation," for referrals that she sends to them. *See* Exhibit J (regarding the 20 gifts received, "… I appreciate that it <u>shows that they appreciate what I do for them</u>…;" regarding the Aman Resort and Spa Gift Card, "<u>That was sent to me by a surgeon. I have sent over 70 facelifts too [sic]. Is he not allowed to give me a massage gc [gift card]</u>") (emphasis added). However, this characterization falls precisely within N.J. Admin. Code §13:35-6.17. Plaintiffs may argue that the "gifts" were unsolicited, but that does not change the analysis. The Hovespian Complaint further illustrates a doctor's explicit "expectation" of referrals in exchange for membership in a fee-based network operated by Farina. Exhibit D.

For purposes of this matter, however, it is not necessary to reach a conclusion as to whether the gifts described in Farina's posts constitute a kickback, whether legal or illegal.  The simple fact is that, regardless of the legality of Farina's conduct, a statement that Plaintiffs "allegedly get kickbacks," under this set of facts and in this legal framework, is not defamatory, much less malicious.  The statement exemplifies speech about a "matter of public concern," as it pertains to ethical standards in making referrals for elective surgery.

## C. **Plaintiffs Fail to State a Claim for Tortious Interference With Prospective Economic Advantage**

Plaintiffs' claim for tortious interference with prospective economic advantage is based upon the same facts as Plaintiffs' claims for defamation and false light.  Once again, Plaintiffs' fail to plead any of the elements for this claim.

Under New Jersey law, "a plaintiff can establish a cause of action for tortious interference with business relationships by showing the following elements: (1) they had some reasonable expectation of economic advantage; (2) the defendants' actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse; (3) the interference caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit, and (4) the injury caused the plaintiff damage."  *Dill v. Yellin*, 725 F. Supp. 3d 471, 488 (D.N.J. 2024).  In this context, malice "does not

literally require ill will but rather is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Id.* at 489.

A plaintiff must identify at least one, distinct lost business opportunity in order to establish a cause of action for tortious interference. *Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787, 790 (3d Cir. 2009) (to state a claim for tortious interference under New Jersey law a plaintiff must identify at least a "single, specific customer" that it lost or could have acquired). A plaintiff must do more than assert that it lost business; "…rather it 'must allege facts that show an existing or prospective economic or contractual relationship' for a 'mere allegation of lost business does not suffice.'" *Eli Lilly & Co. v. Roussel Corp*., 23 F. Supp. 2d 460, 494 (D.N.J. 1998). Accordingly, "the claimed loss of ... unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations." *Harmon v. Borough of Belmar*, No. 17-2437, 2018 WL 6068216, at *8 (D.N.J. Nov. 20, 2018).

Plaintiffs fail to meet the first element of their claim for tortious interference, as they fail to identify any specific economic advantage at issue. Plaintiffs also fail to meet the second element insofar as they fail to identify the portions of the Post that rise to the level of malice, or that an alleged harm was inflicted intentionally or without justification or excuse. Additionally, Plaintiffs fail to meet the requirements for the third element of the count, in that they cannot state that there was a reasonable

probability that they would have obtained the business opportunity but for Omari's conduct since they cannot identify any such opportunity in the first place. Finally, Plaintiffs cannot identify any damages.

Numerous allegations and opinions regarding Plaintiffs' business ethics and professionalism have been part of the public record for an extended period of time, such that any purported harm cannot be causally attributed to Omari. Regardless, the alleged loss of business due to an act of protected speech is simply not actionable.

### D. **Conclusion**

For the foregoing reasons, Omari seeks an order of dismissal pursuant to the anti-SLAPP law, and entry of the proposed form of Order enclosed herewith. Plaintiffs fail to state a *prima facie* case for any of the counts alleged, all of which have been asserted in an effort to stifle protected speech that concerns a public figure and a matter of public concern. Plaintiffs have furthermore failed to present any facts for which there is a genuine issue of material fact that would warrant continuation of the case. Accordingly, dismissal is warranted.

Respectfully submitted,

Daniella Gordon

Date: February 14, 2025